UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERRY W. JOHNSON,

                Plaintiff,                   Case No. 05-72897

vs.

                                 HONORABLE PAUL D. BORMAN

JO ANNE B. BARNHART,          HONORABLE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION**

## I.    BACKGROUND

Terry Johnson brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits under Title II of the Social Security Act. Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, it is Recommended that Plaintiff's motion for summary judgment be DENIED and Defendant's motion for summary judgment be GRANTED.

### A.    <u>Procedural History</u>

Plaintiff originally filed an application for DIB on December 28, 2001, alleging disability since April 9, 2001, due to a broken right wrist, heart attack and pain in his buttocks and back (R. 47, 65). This claim was denied on April 1, 2004, after a November 14, 2003, hearing by Administrative Law Judge (ALJ) Douglas N. Jones (R. 19-27). The Appeals Councils denied Plaintiff's request for review (R. 6-8).

B.    **Background Facts**

1.    ***Plaintiff's Hearing Testimony***

Plaintiff was born on November 3, 1953 (R. 295).  He completed high school and obtained training in welding and on-the-job training in sheet metal.  He was 5'9', weighed 295 pounds and was right-hand dominant (R. 296).  He last worked on April 8, 2001, when he was injured on the job while working as a subcontractor at the General Motors Truck and Bus plant (R. 296, 310).  He receives $644 per week in Workers Compensation (R. 297).  He no longer has health insurance (R. 311).

He was a journeyman sheet metal worker and union representative and steward during his time at General Motors (R. 298-99).  His job required him to hold safety meetings, read safety reports, "take care" of new employees and "whatever else" the company required (R. 300).

He felt that he was unable to return to work due to the following impairments: severe carpal tunnel in both hands, a back problem and a right wrist fracture that improperly healed and caused limited strength and movement.  The right wrist was painful with use or when the weather changed or was damp (R. 301).  The carpal tunnel caused his hands to go numb frequently.  This happened when he drove and woke him up at night.  He had severe lower back pain, which did not radiate into his legs, but was constant (R. 301-302).  Lifting, walking, standing and sitting aggravated his back pain.  He was most comfortable in a recliner or in bed, though he still felt some discomfort in his recliner (R. 302).  He had difficulty sleeping due to his sleep apnea machine and back numbness that occured if he did not readjust his position during the night (R. 303).   He described his daily activities as consisting of "not much of nothing".  He spent 60-70% of his day in his recliner (R. 305).  On a good day he assisted his wife with dishes and cooked dinner.  He cut the grass with a riding lawn mower by riding the mower for 15-20 minutes at a time and then resting due to back pain (R. 303-304).  He socialized with family and friends (R. 304).  He could lift and carry 10 pounds, sit for 45

minutes, stand for 20 minutes and could walk for short distances (R. 304-305).  He read books, watched television and worked on puzzle books (R. 305).  He had no difficulties concentrating and could take care of his own personal needs (R. 305-306).  Plaintiff drives a car 4-6 times per week to the store or to visit his mother and took a recreational vehicle trip to the Upper Peninsula of Michigan (R. 297-98).  He smoked a pack of cigarettes a day (R. 309).  His doctor advised him to lose weight and exercise and he was trying to comply with this instruction.

### 2.   *Medical Evidence*

On March 12, 2001, Plaintiff saw his cardiologist, David W.T. Chen, M.D., for a follow-up exam at which time he was doing well with a clinical impression of coronary artery disease post inferior myocardial infarction without angina, hypercholesterolemia with a low HDL on Lipitor (under reasonable control) and well-controlled hypertension (R. 196).  Plaintiff was advised to lose weight, continue medications and return in six months for a follow-up.

On April 5, 2001, Plaintiff received emergency room treatment for a superficial laceration to his left index finger sustained while at work (R. 119-22).

On April 9, 2001, Plaintiff was treated at McLaren Regional Medical Center for a 9 centimeter scalp laceration and right wrist deformity he had sustained as a result of a 9 foot fall (R. 126).  A right wrist x-ray revealed a displaced radius/ulna fracture (R. 127).

On April 11, 2001, Plaintiff was seen by orthopedist Ishwar Dass, M.D., for follow-up from the fall two days earlier that had resulted in a right wrist injury with an acute open fracture of the distal radius (R. 186).  Dr. Dass found Plaintiff's neurovascular status intact and X-rays showed reduction on the fracture.  Dr. Dass ordered a CT study.

On April 16, 2001, Dr. Dass found that Plaintiff had fairly good range of motion of the fingers, was

3

neurologically intact and overall his "X-rays did not look bad"(R. 185).

An April 18, 2001, pre-operative chest X-ray was negative (R. 161). On April 19, 2001, Plaintiff underwent open reduction internal fixation of the right wrist distal radius fracture with application of pins and external fixator (R. 157-58, 162).

On April 23, 2001, Plaintiff had a follow-up exam with Dr. Dass and was referred to physical/occupational therapy for a an elbow splint (R. 163, 183, 184). Dr. Dass noted that Plaintiff was still smoking and told Plaintiff of the risks of continuing to smoke and bone healing (R. 184).

At a May 4, 2001, follow- up examination Plaintiff was doing well with better digital motion (R. 182). X-rays showed good alignment but no consolidation.

At a May 25, 2001, follow-up Plaintiff was doing well, his digital motion was still a little bit stiff but improving and his elbow and shoulder range of motion were good (R. 181). X-rays showed the fracture was in good position with some consolidation present.

On May 29, 2001, Plaintiff saw Latonya Thomas, M.D., to have Coumadin drawn and manipulated (R. 210). Plaintiff expressed no health concerns. Plaintiff denied experiencing chest pain or shortness of breath and indicated that he had redness, flushing and burning sensation as a side effect of Niaspan. Dr. Thomas noted Plaintiff was obese and continued to smoke a pack of cigarettes per day, though he realized the consequences and the risk he was taking. Dr. Thomas noted that Plaintiff was unwilling to talk about smoking cessation modalities. Dr. Thomas said Plaintiff had not yet decided to stop smoking.

On June 5, 2001, Dr. Dass performed surgery to remove Plaintiff's fixator and pins (R. 165). At the time of the procedure, x-rays showed the fracture was consolidated. On follow-up ten days later, Dr. Dass said Plaintiff was doing well in a cast, he had better digital motion and, while there was some settling at the fracture site, overall alignment looked good (R. 179).

4

On June 25, 2001, Plaintiff's cast was removed; tenderness and swelling were decreased (R. 178). Plaintiff had good range of motion of the digits and about forty degrees of active motion at the wrist and full flexion and extension. Rotation was fairly good. X-rays showed some settling of fragments and an ulnar variance of about two to three millimeters. Dr. Dass prescribed a removable brace and physical therapy for range of motion and grip strength exercises (R. 175, 177-78).

Plaintiff attended occupational/physical therapy for his right upper extremity between June and July 2001 (R. 109-18, 204-206).

On June 27, 2001, Plaintiff reported that his middle finger had been stiff since the previous Fall, that he had been diagnosed with bilateral carpal tunnel and that he had decreased endurance and shortness of breath since his March 1998 heart attack (R. 205). Plaintiff was noted be slower to complete tasks and had decreased range of motion, strength, and endurance of the right upper extremity. He was also noted to have an active lifestyle and good potential for rehabilitation goals of improving strength, range of motion, and coordination of the right upper extremity.

On July 25, 2001, Plaintiff was discharged from occupational therapy because he was able to complete the remaining therapy, consisting of heat and range of motion exercises, independently (R. 204).

At an August 6, 2001, follow-up Plaintiff reported that he was still in pain but that it was getting better (R. 174). Dr. Dass removed Plaintiff's brace and he had good flexion and extension, limited pronosupination (especially supination) and improving digital motion. X-rays showed the fracture was in "fairly good position." There was some collapse and dorsal angulation collapse, with 3-4 mm of positive ulnar variance and 5 degrees of dorsal angulation. Dr. Dass noted that Plaintiff was a smoker and that smoking could lead to delayed healing and more pain, which Plaintiff understood. Dr. Dass discussed quitting with Plaintiff. Plaintiff reported there were no restricted jobs for him at work. Dr. Dass prescribed

physical therapy again with the hope of getting Plaintiff back to work in three months.

Re-evaluated for physical therapy on August 29, 2001, Plaintiff was again noted to have good potential for rehabilitation, including improved right hand strength, range of motion, and dexterity (R. 202-03).   In September and October 2001, the therapist reported Plaintiff demonstrated increases with active range of motion measurements and said Plaintiff was able to tolerate moderate increases in time and resistance for functional activities (R. 199-201).  The therapist said treatment was progressing according to plan (R. 199).  On November 5, 2001, the therapist reported Plaintiff continued to demonstrate gains and recommended discharge to home exercise program (R. 198).

On September 19, 2001, Plaintiff saw Dr. Chen complaining of some chest pain and heart fluttering which was getting slightly worse (R. 194-95).  Physical examination was normal and an EKG revealed a sinus rhythm with evidence of an old inferior myocardial infarction and no other new changes (R. 194).  Dr. Chen diagnosed coronary artery disease with prior inferior myocardial infarction with more angina and dyspnea, hypercholesterolemia (on medication), hypertension (controlled) and obesity.  He ordered blood work, an echocardiogram and a holter monitor test.

On September 24, 2001, Plaintiff complained to Dr. Thomas of problems with his left middle finger, back pain in the shoulder region, and left buttock pain (R. 209).  Plaintiff said he had no problems prior to the fall at work.  Plaintiff said he had difficulty with continuous, unsupported sitting.  Dr. Thomas noted no back tenderness.  Dr. Thomas suggested physical therapy and ordered an x-ray of the left middle finger, which showed no evidence of any abnormality (R. 170, 209).  Plaintiff indicated he wanted to lose weight, and the doctor advised him to eat less and exercise more (R. 209).

On October 8, 2001, Dr Dass said Plaintiff's range of motion was improving, but he was progressing very slowly, with pain on a daily basis and a low grip strength (R. 171).  He believed Plaintiff continued to

6

smoke.  X-rays showed the fracture was consolidated with a slight loss of intra articular height.  Dr. Dass felt Plaintiff may develop post-traumatic arthritis.  Dr. Dass said he did not think Plaintiff could return to his job as a steel or construction worker.  He said Plaintiff was trying to file for disability and he "would agree for this."  Plaintiff was continuing to work on stretching and strengthening and follow-up as-needed.

On October 18, 2001, Plaintiff complained to Dr. Chen of chest fluttering and precordial chest pain (R. 192).  Dr. Chen examined Plaintiff and administered an echocardiogram (R. 190- 93).  Dr. Chen stated that, subjectively, Plaintiff developed angina type symptoms, but that, objectively, there were no EKG changes with stable vital signs with good pulse oximetry (R. 192).  There was evidence of a medium-sized fixed defect in the inferior wall with a slightly enlarged left ventricular cavity, but overall no significant change in the overall nuclear image findings (R. 191).  At an additional follow-up eleven days later, Dr. Chen said the testing showed that left ventricular function was well-preserved despite the slightly enlarged cavity dimension and diastolic volume (R. 188-89).  He noted Plaintiff's lipid profile had recently worsened (R. 188).  Dr. Chen said Plaintiff's coronary artery disease was stable, with slightly dilated ischemic cardiomyopathy without decompensation.  Dr. Chen increased Plaintiff's weight-loss and cholesterol medications and adjusted his cardiac medication for better protection (R. 189).  Dr. Chen advised a six-month follow-up.

On November 6, 2001, Plaintiff reported to Dr. Thomas that he was having quite a bit of discomfort with his wrist and was undergoing evaluations with regard to his social security disability claim (R. 208).  Plaintiff was in no acute distress but had gained weight since his last visit two months prior, and Dr. Thomas again advised Plaintiff to quit smoking and lose weight.

On December 10, 2001, Dr. Thomas saw Plaintiff for complaints of changing moles, right ear discomfort and back pain (R. 207).  Dr. Thomas noted Plaintiff complained of intermittent back discomfort

7

after falling on his right side some time prior. Dr. Thomas noted discomfort over the sacro-iliac joint but no pain on straight leg raising bilaterally and objectively was in no acute distress. She noted no neurologic deficits and recommended back strengthening exercises and perhaps physical therapy.

On May 28, 2002, Thomas Olson, Psy. D, performed a psychological examination of Plaintiff for the Michigan Disability Determination Service (DDS) and diagnosed Plaintiff with Major Depressive Disorder mild recurrent and a GAF of 59[1] (R. 224-30). Dr. Olson noted that Plaintiff used a sense of humor to cope with his chronic pain and depression; denied psychotic symptoms or paranoid, prosecutory or suicidal ideations and reported that he got along well with people but was irritable lately due to medical problems and job loss (R. 226-27).

On May 30, 2002, a state agency disability examiner reviewed the record and concluded that Plaintiff could perform light work, lifting up to ten pounds frequently and twenty pounds occasionally and standing and sitting for up to six hours each in an eight-hour workday, but that he was limited in the use of his upper extremities for pushing or pulling (R. 233). The doctor opined Plaintiff should never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs (R. 234). He said Plaintiff was could perform constant overhead reaching and feeling bilaterally and constant handling and fingering with his left upper extremity but was limited to frequent handling and fingering with his right upper extremity (R. 235). The examiner also said Plaintiff should avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation (R. 236). The examiner noted that Plaintiff's current cardiac testing was essentially

---

[1]The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32. A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*

8

unremarkable, and he opined that Plaintiff's statements regarding his decreased daily activities was not supported by the objective medical evidence in the record (R. 237). The examiner reviewed the evidence regarding Plaintiff's wrist fracture (R. 237), and he opined that Plaintiff was not disabled (R. 33).

On June 9, 2002, Bruce Douglass, Ph.D., completed both a Mental Residual Capacity Assessment and Psychiatric Review Technique Form (PRTF)(R. 243-60). On the former Dr. Douglass found that Plaintiff had moderate limitations in his ability to understand, remember or carry out detailed instructions, maintain attention and concentration, interact with the general public and complete a normal workday without interruption (R. 243-44). On the "B"criteria of the PRTF he concluded that Plaintiff's Major Depressive Disorder caused the following limitations: mild restrictions in daily living; mild difficulties in maintaining concentration, persistence or pace and moderate difficulties in maintaining social functioning (R. 257).

In July 2002, Plaintiff underwent EMG and nerve conduction testing for evaluation of carpal tunnel syndrome and numbness in the left thigh (R. 261). The testing showed findings of bilateral carpal tunnel syndrome which was predominantly motor. There was no evidence of cervical or lumbrosacral radiculopathy or plexopathy involving the left lower extremity but Plaintiff's clinical symptoms suggested meralgia paresthetica, and Plaintiff had mild left ulnar neuropathy at the elbow joint but no significant denervation (R. 262). The examiner said the study was complex and thus precluded a prognosis, but advised Plaintiff should be followed clinically for signs of nerve degeneration and might benefit from surgical release of the median nerves at both wrist joints.

In February 2003, Plaintiff underwent an evaluation by hand surgeon Richard M. Singer, M.D. in connection with his Worker's Compensation claim (R. 263-65). Dr. Singer examined Plaintiff and reviewed his records (R. 263). Plaintiff complained of decreasing strength and range of motion, and aching and pain

of the right arm.  Plaintiff also claimed to have associated back and head injuries.  Physical examination revealed limited extension of the neck, excellent shoulder motions, full elbow motion, non-tender medial and lateral epicondyles, limited range of right wrist motion, positive median nerve compression sign on the right, negative abduction test and reverse Phalen signs, negative carpal instability signs and Finkelstein test, and effort-dependent Jamars with positive rapid exchange.  X-rays revealed a healed distal radius fracture with continued deformity.  Dr. Singer concluded that Plaintiff had abnormality of the right carpal tunnel, and a ulnar styloid fracture, which had gone to nonunion.  Dr. Singer opined that Plaintiff was capable of work but that an exact nature of his capabilities was difficult to determine given the lack of a functional capacity evaluation, and that an updated EMG would be helpful to assess the median nerve status.  Dr. Singer said, though, that he would recommend the basic restrictions of no forceful gripping or impact tool use, and no climbing because of Plaintiff's complaint of weakness (R. 264-65).  Dr. Singer stated that he did not believe Plaintiff was totally disabled with his wrist fracture (R. 265).  He said he thought Plaintiff had "reached maximum medical improvement given the length of time since the fracture" and that there would not be an increased incidence of arthritis other than what he currently had.

### 4.   *Vocational Evidence*

Mary Williams served as the vocational expert (VE) in this matter (R. 311).  The hypothetical posed to VE Williams by ALJ Jones was as follows: an individual of Plaintiff's age, education and past work experience, who was able to perform light work that involved occasional bending at the waist and knees, occasional kneeling, no crawling, no climbing ladders, occasional climbing of stairs, protection from airborne pollutants and fumes with a respirator or otherwise, frequent but not constant use of right hand for gross or fine manipulation, no forceful or sustained gripping or grasping with either hand, no constant or repetitive wrist movements with either hand, no detailed instructions, no extended periods of concentration and only

10

occasional interaction with members of the general public (R. 312).

VE Williams testified that such a person could not perform Plaintiff's past work because it would was classified as heavy (R. 313). His past work as a sheetmetal worker was also considered semiskilled, but the skills were not transferable to other professions. VE Williams testified that the following jobs were available that the hypothetical person could perform: 12,900 positions in inspecting, 2,400 in sorting and 3,780 in supply clerking (R. 313-314). A sit/stand option would reduce the number of available positions to: 6,000 in inspecting and 1,500 in sorting (R. 314). If the person were limited to sedentary work with the same restrictions VE Williams testified that the following jobs would be available to them: 1,780 in inspecting, 1,570 in surveillance system monitoring and 1,050 in sorting (R. 314).

### 5.   *The ALJ's Decision*

ALJ Jones found that Plaintiff met the disability insured requirements of the Act through the December 31, 2006, and that he had not engaged in substantial gainful activity since the alleged onset of disability, April 9, 2001 (R. 20).

Plaintiff had a combination of impairments that were considered severe, as defined in the regulations, as follows: "osteoarthritis of the right wrist status post comminuted distal radius fracture with open reduction and internal fixation times two (4/01) resulting in residual deformity and nonunion of an ulnar styloid fracture; bilateral carpal tunnel syndrome; coronary artery disease status post myocardial infarction (4/98) with slight dilated cardiomyopathy with decompensation; hypertension; mild chronic obstructive pulmonary disease; sleep apnea; exogenous obesity; degenerative disc and bone disease of the cervical spine; mild osteoarthristis in the pelvis; major depression, mild recurrent; and a history of cannibus abuse (in remission since August 1999)" (R. 22-23).

"Despite the presence of a 'nonunion of ulnar styloid fracture,' Medical Listing 1.07, which applies

to upper extremity fractures, is not met because claimant's right wrist is not under 'continued medical management,' and no further surgical procedures are planned" (R. 23). The severity of the claimant's conditions did not meet or equal the requirements of any impairment listed in Appendix 1, Subpart P, Part 404 (the "Listing") (R. 26).

No period of 12 consecutive months elapsed where Plaintiff lacked the residual functional capacity (RFC) to perform light work with the following limitations: occasional (up to 33%) bending at the waist or knees, occasional kneeling, no crawling, only occasional climbing stairs, no climbing ladders, frequent but not constant (up to 66%) gross or fine manipulation with dominant right hand, no forceful or sustained gripping or grasping with right hand, no constant repetitive wrist movements with the right hand, no exposure to dust/fumes or airborne pollutants, no detailed instructions, no extended periods of concentration and only occasional interaction with general public (R. 26).

ALJ Jones found Plaintiff's claims regarding his limitations not fully credible because

[a]lthough the documented impairments undoubtedly generate symptoms of the general type described, the claimant's assertions concerning their intensity, persistence and functionally limiting effects are not substantiated by the objective clinical findings and medical tests in the record which show normal cardiac function, and document no low back or lower extremity impairment beyond mild x-ray evidence of osteoarthiritis in the pelvis. His impairments have not required hospitalization, surgical intervention or other aggressive treatment since the April 2001 wrist fracture repair, contrary to what would be expected in the case of a truly incapacitating condition, and prescribed medication has been helpful in relieving symptoms when taken as instructed. ... The claimant's allegations are also inconsistent with his ordinary activities, and his failure to stop smoking or lose weight (Exhibit 25F1).

(R. 24).

Plaintiff was unable to perform his past relevant work and had no vocational skills that were transferable to jobs within his residual functional capacity (R. 24).

Using the Medical-Vocational Guidelines as a framework, together with the testimony of the VE, the

ALJ determined that Plaintiff could perform a significant number of jobs in the economy referring to the limited number of light jobs identified by the VE, and Plaintiff was, therefore, not disabled (R. 27).

## II.   ANALYSIS

### A.   Standards Of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).   The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[2]  A response to a flawed hypothetical question is not substantial evidence and cannot

---

[2] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

support a finding that work exists which the Plaintiff can perform.

**B.    Factual Analysis**

Plaintiff raises three challenges to the Commissioner's decision: (1) the ALJ erred in finding that the nonunion of Plaintiff's right wrist fracture did not meet or equal Listing 1.07; (2) the ALJ erred in rejecting Plaintiff's testimony regarding the extent of his exertional limitations and pain; (3) the hypothetical question posed to the VE did not adequately describe Plaintiff's limitations.

***1.      Meeting Listing 1.07***

Pursuant to 20 C.F.R. § 404.1520(a)-(e),

> If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir.1997).

The claimant has the burden of proof on this issue. *Id.* Plaintiff argues that he should have been found to be disabled at Step Three because his non-unified right wrist fracture met Listing 1.07:

> Fracture of an upper extremity with nonunion of a fracture of the shaft of the humerus, radius, or ulna, *under continuing surgical management, as defined in 1.00M, directed toward restoration of functional use of the extremity*, and such function was not restored or expected to be restored within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App. 1 (1.07).[3]

---

[3]"Under continuing surgical management, as used in 1.07 and 1.08, refers to surgical procedures and any other associated treatments related to the efforts directed toward the salvage or restoration of functional use of the affected part. It may include such factors as post-surgical procedures, surgical complications, infections, or other medical complications, related illnesses, or related treatments that delay the individual's attainment of maximum benefit from therapy. When burns are not under continuing surgical management, see 8.00F." *Id.* at (1.00)(M)

ALJ Jones found that Plaintiff's non-unified ulnar styloid fracture did not met Listing 1.07 because his right wrist was not under continued surgical management and there were no further surgical procedures planned (R. 23). Plaintiff argues that, while it is true no further surgeries were planned for his right wrist fracture, his impairment still meets Listing 1.07 because the reason no future surgeries were planned was because his surgeon had informed him that there was no surgical intervention available to repair the remaining non-union.

Plaintiff's counsel analogizes ALJ Jones' decision that Plaintiff's non-unified fracture did not meet the Listing to denying a blind man disability benefits because his eye surgeon has determined that no future surgery will restore his sight. Yet, in that example the claimant would be left with non-functioning eyes, clearly a disability, whereas Plaintiff has not shown that his right wrist would be considered non-functioning as defined by the Listing.

The Listing describes the *required* loss of function due to an upper extremity impairment as "the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment" which lasts, or is expected to last, for at least 12 months. 20 C.F.R. Pt. 404, Subpt. P, App. 1 (1.00)(B)(2)(a).

> Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

*Id.* at (1.00)(B)(2)(c).

15

Plaintiff does not point to evidence in the medical records that would suggest that his treators limited his ability to perform gross or fine movements with his upper extremities. The Physical Residual Functional Capacity Assessment Form completed by the DDS examiner suggests that Plaintiff can reach overhead and feel without limitations bilaterally and perform handling and fingering constantly with his left hand and frequently with his right hand (R. 235). Further, Plaintiff's testimony did not provide sufficient evidence to sustain a finding of non-function, even if ALJ Jones had fully credited Plaintiff.

When Plaintiff was questioned by his attorney at the hearing as to what current problems he was experiencing with his wrist he stated that it was not as strong as it had been, did not bend well and caused him pain and discomfort with weather changes and use (R. 301). In Plaintiff's Daily Activity Sheet he listed lawn mowing, feeding the dog, getting dressed, taking out the trash, shaving and showering and indicated that he did need not assistance with his personal care (R. 80-83).

Therefore, it cannot be said that the ALJ did not have a sufficient basis for his finding that the Plaintiff failed to meet his burden of showing that he met or equalled Listing 1.07 in order to be determined disabled at Step Three.

### 2.   *ALJ's Credibility Finding*

Commissioner's regulation 20 C.F.R. 404.1545 requires consideration of all medical and non-medical evidence, including the claimant's subjective accounts of symptoms, in determining RFC. Yet, subjective evidence is only considered to "the extent...[it] can reasonably be accepted as consistent with the objective medical evidence and other evidence (20 C.F.R. 404.1529(a))." *Duncan v. Secretary of Health & Human Servs.,* 801 F.2d 847, 852 (1986). While the issue of a claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion when making a determination of disability, *(Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981); *Jones v.*

*Commissioner of Social Sec.*,  336 F.3d 469, 476 (6th Cir. 2003)), there are limits on the extent to which

an ALJ can rely on "lack of objective evidence" in discounting a claimant's testimony.

Subjective complaints of a claimant can support a claim for disability, if there is also objective

medical evidence of an underlying medical condition in the record that would explain such pain. *See Young*

*v. Secretary of Health & Human Servs.,* 925 F.2d 146, 150-51 (6th Cir. 1990); *Duncan v. Secretary of*

*Health & Human Servs.,* 801 F.2d 847, 852 (6th Cir. 1986).  While the underlying condition must have an

objective basis, neither the Social Security Act nor the regulations require a claimant to prove the degree

of pain and limitations by objective medical evidence.  Thus, an adjudicator may not reject a claimant's

subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged

severity of pain.  Section 404.1529(c)(2),[4]  *see also  Duncan,* 801 F.2d at 853. *Cotton v. Bowen,* 799 F.2d

1403, 1407 (9th Cir. 1986); *Bunnell v. Sullivan,* 947 F.2d 341, 345 (9th Cir. 1991) (*en banc*); *Benson v.*

*Heckler,* 780 F.2d 16, 17 (8th Cir. 1985); *Halpin v. Shalala,* 999 F.2d 342, 346 (8th Cir. 1993).

*Mickles v. Shalala,* 29 F.3d 918, 921 (4th Cir. 1994), made it clear that "[t]here is no practical

difference between requiring a claimant to prove pain through objective evidence and rejecting her

subjective evidence because it is not corroborated by objective evidence."  Nor can an ALJ merely recount

the medical evidence and claimant's daily activities and then without analysis summarily conclude:

> Based upon an overall evaluation of the relevant written evidence of record
> as summarized above, the undersigned finds it does not contain the requisite

---

[4]  29 C.F.R. § 404.1529(c)(2) states:
> We will not reject your statements about the intensity and
> persistence of your pain or other symptoms or about the effect
> your symptoms have on your ability to work solely because the
> available objective medical evidence does not substantiate your
> statements.

> clinical, diagnostic or laboratory findings to substantiate or form the
> underlying basis for claimant's testimony regarding totally disabling pain
> and other disabling impairments. . . .

*Felisky v. Bowen,* 35 F.3d 1027, 1039 (6th Cir. 1994).

If the ALJ rejects a claim of pain, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons. SSR 96-7p directs that with respect to findings on credibility they cannot be general and conclusory findings but rather must be specific. The ALJ must say more than that the testimony on pain is not credible. In addition to the objective medical evidence the ALJ must also consider the claimant's daily activities; the location, duration, frequency and intensity of pain; precipitating and aggravating factors; type, dosage effectiveness and side effects of medication; treatment other than medication; and any other measures taken to relieve pain. *Id.* at 1039-1040.

Though Plaintiff argues that ALJ Jones failed to cite evidence or give a reason for rejecting evidence supporting Plaintiff's subjective complaints, the record shows that ALJ Jones considered the objective medical evidence, Plaintiff's daily activities, his failure to take other measures to relieve his pain and increase chances of bone healing (weight loss and smoking cessation), medication effects and side effects and the lack of aggressive treatment (notwithstanding the wrist surgery) in determining that the extent of Plaintiff's subjective complaints were not "fully credible":

> [a]lthough the documented impairments undoubtedly generate symptoms of the general type
> described, the claimant's assertions concerning their intensity, persistence and functionally
> limiting effects are not substantiated by the objective clinical findings and medical tests in
> the record which show normal cardiac function, and document no low back or lower
> extremity impairment beyond mild x-ray evidence of osteoarthiritis in the pelvis. His
> impairments have not required hospitalization, surgical intervention or other aggressive
> treatment since the April 2001 wrist fracture repair, contrary to what would be expected in
> the case of a truly incapacitating condition, and prescribed medication has been helpful in
> relieving symptoms when taken as instructed. ... The claimant's allegations are also
> inconsistent with his ordinary activities, and his failure to stop smoking or lose weight
> (Exhibit 25F1).

18

(R. 24).

Plaintiff had the burden of providing objective evidence confirming the severity of the alleged pain, or establishing that the medical condition is of such a kind and severity that it could reasonably be expected to produce the allegedly disabling pain. *Duncan*, 801 F.2d at 853 (6th Cir. 1986), notes "First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *See also, McCormick v. Secretary*, 861 F.2d 998, 1002-1003 (6th Cir. 1988); 20 C.F.R. § 404.1512 and 416.913(e)(requiring claimants to provide all medical evidence in support of their claims).

Here, Plaintiff has substantial objective and clinical diagnostic evidence of underlying osteoarthritis of the right wrist (status post comminuted distal radius fracture with open reduction and internal fixation resulting in residual deformity and nonunion of ulnar styloid fracture), carpal tunnel syndrome, coronary artery disease (status post myocardial infarction with slight dilated cardiomyopathy with decompensation), hypertension, mild chronic obstructive pulmonary disease, sleep apnea, obesity, degenerative bone disease in the cervical spine and mild osteoarthritis in the pelvis confirming his diagnosis of a severe "underlying medical condition." As in most cases, there is no objective evidence of the pain itself. Thus, the analysis must be "whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain, or other incapacitating symptom."

Plaintiff alleges that he experiences pain in his right wrist with use and weather changes, he can lift no more than 10 pounds or his back will "go out", that he can only stand for 20 minutes before he has to sit down and his back pain is aggravated by any walking, standing and sitting and he is most comfortable

in his recliner or in his bed (R. 302, 304).  ALJ Jones assessed Plaintiff's RFC as follows:  perform light

work with occasional (up to 33%) bending at the waist or knees, occasional kneeling, no crawling, only

occasional climbing stairs, no climbing ladders, frequent but not constant (up to 66%) gross or fine

manipulation with dominant right hand, no forceful or sustained gripping or grasping with right hand, no

constant repetitive wrist movements with right hand, no exposure to dust/fumes or airborne pollutants, no

detailed instructions, no extended periods of concentration and only occasional interaction with general

public (R. 26).[5]

     ALJ Jones' RFC assessment and Plaintiff's alleged limitations differ substantially only with regard

to Plaintiff's alleged weight lifting restriction and need to recline or lay down to be comfortable – both of

which Plaintiff attributed to his back pain.  Yet, there is not sufficient objective evidence to support  a

disabling back condition.  Plaintiff's medical records do contain references to complaints of back pain and

x-rays confirm degenerative changes, but as ALJ Jones pointed out, there has been no aggressive or

extensive therapy such that would indicate that the problem is severe enough to confine Plaintiff to his

---

[5]In Plaintiff's motion it is also alleged that he was diagnosed with Major Depression with visual hallucinations, anti-social behavior, claustrophobia, lack of libido and difficulty getting along with strangers (Dkt. # 7, p. 14, 18).  Yet, Dr. Olson, to whom this diagnosis is attributed, diagnosed Plaintiff with Major Depressive Disorder mild recurrent and did not reference these other symptoms (R. 230).  Dr. Olson's report also indicates that Plaintiff denied experiencing psychotic symptoms in the past or present and reported that he had good interpersonal relationships (but had been irritable due to his medical condition and job loss) (R. 226, 227).  As stated above, the DDS examiner assessed Plaintiff as having moderate limitations in his ability to understand, remember or carry out detailed instructions, maintain attention and concentration, interact with the general public and complete a normal workday without interruption (R. 243-44).  Plaintiff testified that he had no problems with concentration (R. 305).
     Plaintiff argues that ALJ Jones discounted Dr. Olson's opinion, but there is no evidence in the record to indicate this is the case.  ALJ Jones cited Dr. Olson's finding (R. 22) and included major depression in Plaintiff's list of severe impairments (R. 23).  ALJ Jones also provided in Plaintiff's RFC for all limitations described by the DDS psychological examiner.  Therefore, Plaintiff's credibility argument, as it pertains to his mental capacity is without merit.

recliner or his bed.  In fact, there is not evidence that Plaintiff complained to his treators that his back pain had reached this level of severity.  Further, Plaintiff has not complied with his physicians' repeated advice to lose weight.  This does not by itself preclude a finding of disability, *see Johnson v. Secretary of HHS*, 794 F.2d 1106, 1113 (6th Cir.1986), but could properly be interpreted by ALJ Jones to indicate that perhaps a claimant's condition is not as painful as he alleges when obesity aggravates his condition.  *Walton v. Secretary of Health and Human Services*, 1989 WL 43915, *4 (6th Cir.  1989).

Review of a credibility determination requires the court "to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying. *Walters*, 127 F.3d at 528 (citations omitted). Therefore, we are limited to evaluating whether or not the ALJ's explanations for partially discrediting [a claimant] are reasonable and supported by substantial evidence in the record." *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  ALJ Jones' reasons for discrediting Plaintiff's complaints of disabling pain are supported by the record.  Therefore, it is recommended that ALJ Jones' credibility determination be upheld.

### *3.    Hypothetical Posed to VE*

Because Plaintiff's impairments were found to prevent him from doing past work, the Commissioner was required to consider his RFC, age, education and past work experience to determine if he could perform other work.  If he could not perform other work, the Commissioner would have been required to find him disabled.  20 C.F.R. § 404.1520(f).  The Commissioner has the burden of proof on this "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir.1999).

To meet the burden of showing that Plaintiff could perform work that is available in the national

economy, the Commissioner must make a finding "supported by substantial evidence that [he] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.,* 820 F.2d 777, 779 (6th Cir.1987).  This kind of "[s]ubstantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [his] individual physical and mental impairments.' " *Id.* (citations omitted).

Taking into account Plaintiff's RFC, age, education, past work experience, and the testimony of VE Williams, ALJ Jones determined that Plaintiff was able to perform other work and was, therefore, not disabled.

Plaintiff argues that substantial evidence does not support ALJ Jones' conclusion that he could perform other work because the ALJ's formulation of the RFC and the hypothetical question posed to VE Williams did not "accurately portray [his] individual physical and mental" impairments.  This argument is based upon Plaintiff's argument that (a) his right wrist fracture impairment met Listing 1.07, (b.) his credibility regarding his subjective pain complaints should not have been discredited and (c.) his mental residual capacity should have included findings beyond major depression based on the alleged findings of psychotic symptoms by Dr. Olson.  These arguments have all been addressed and discounted above.

Plaintiff also argues that ALJ Jones erroneously used the designation "light work" in Plaintiff's RFC where the limitations ALJ Jones added would effectively limit Plaintiff from even performing the full capacity of sedentary work and would "reduce the number of jobs in the light category, as to make" the use of the Grids as a framework "a mockery" (Dkt. # 7, p. 17).

This argument is without merit given that VE Williams testified to an exact number of jobs, 19,080, that would be available to a person in the light category with the limitations described in Plaintiff's RFC.  If Plaintiff's argument is correct VE Williams' answer should have been zero – under Plaintiff's theory

there being no light jobs and only sedentary jobs available for a person with the RFC ALJ Jones provided. VE Williams testified that if the hypothetical person were restricted to sedentary jobs the number of jobs would be reduced to 4,400.[6]  Therefore, even if one assumed for the sake of argument that all of the 4,400 sedentary jobs to which VE Williams was referring had been included in the pool of 19,080 light jobs she testified the hypothetical person could perform, subtracting these jobs would still leave 14,680 light jobs that a person with Plaintiff's RFC could perform.

## III.   RECOMMENDATION

For the reasons stated above, It is Recommended that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED.  The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and

---

[6]1,780 in inspecting, 1,570 in surveillance system monitoring and 1,050 in sorting (R. 314).

23

order such page limit is extended by the Court.  The response shall address specifically, and in the same

order raised, each issue contained within the objections.

Dated: June 20, 2006                              s/Steven D. Pepe
Ann Arbor, Michigan                              United States Magistrate Judge

Certificate of Service

      I hereby certify that a copy of this Report and Recommendation was served upon the attorneys of record by electronic means on June 20, 2006.

s/William Barkholz
Deputy Clerk